UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  S1-4:16 CR 426 CDP (JMB) |
| | ) | |
| ISRAEL ANGELES-MONTEZUMA, | ) | Defendant #1 |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE – WIRETAP MATTERS**

Currently before the Court is a motion to suppress wiretap evidence filed on behalf of

Defendant Israel Angeles-Montezuma (ECF No. 870).[1]  The government has filed a response in

opposition.  (ECF No. 939)  Pretrial matters have been referred to the undersigned United States

Magistrate Judge, under 28 U.S.C. § 636(b).  The undersigned recommends that Angeles-

Montezuma's motion to suppress wiretap evidence be denied.

**RELEVANT PROCEDURAL BACKGROUND**

Angeles-Montezuma is one of forty-two defendants charged in this cause with conspiracy

to traffic in methamphetamine, among other alleged crimes.  (ECF No. 226)  During the

investigation of this conspiracy, the government applied for and obtained wiretap orders directed

---

[1] Co-defendants William Gillman and Catherine Woolford also filed motions to suppress wiretap evidence.  (ECF Nos. 844, 876)  Gillman and Woolford have since indicated an intention to withdraw their pending motions and are scheduled to enter guilty pleas.  (See, e.g., ECF Nos. 1068, 1069)  Gillman and Woolford's motions to suppress were directed to a different wiretap order than the order challenged by Angeles-Montezuma.  Nonetheless, after conducting an evidentiary hearing, and based on the existing record, the undersigned would have issued a Report and Recommendation recommending that Gillman and Woolford's motions be denied.

In accordance with the Court's prior scheduling orders, each of the remaining co-defendants waived their respective rights to file motions directed at the wiretap evidence.

to the following five telephone numbers:  (314) 478-9454 (TT #1);[2] (314) 440-2414 (TT #2); (816) 682-3217 (TT #3); (314) 919-5656 (TT #4); and (618) 952-1010 (TT #5).  Angeles-Montezuma challenges only the wiretap order directed at TT #5.

Broadly speaking, Angeles-Montezuma contends that the affidavit submitted in support of TT #5, (618) 952-1010, fails to satisfy the necessity requirements of Title III, and that the government failed to follow reasonable minimization procedures.  Thus, Angeles-Montezuma asks the Court to suppress his wire and electronic communications seized pursuant to the Title III order directed to TT #5, and any evidence derived therefrom.  The government counters that the affidavit meets the necessity requirement and that the monitoring agents followed reasonable minimization procedures.

On April 25, 2017, the undersigned held an evidentiary hearing on Angeles-Montezuma's motion to suppress wiretap evidence.  Angeles-Montezuma was present with his attorney Yan E. Shrayberman and a Spanish language interpreter.  The government was represented by Assistant United States Attorneys Sirena Wissler and Jeannette Gravis.  The government presented testimony and evidence through one witness—S/A David Wilmsmeyer.  S/A Wilmsmeyer executed the affidavit submitted as part of the application to monitor TT #5.  At the April 25th hearing, the government introduced Government's Exhibits 1-9, which are summarized as follows:

1.    Minimization Letter to S/A Wilmsmeyer;
2.    Application for Initial Interception of Wire and Electronic Communications for TT #5;
3.    Affidavit of S/A Wilmsmeyer In Support of Application;
4.    Order Authorizing Initial Interception of Wire and Electronic Communications for TT #5 – 4:16 MC 135 CDP (Mar. 3, 2016);
5.    First 10-Day Report;
6.    Second 10-Day Report;

---

[2] As used herein, "TT" refers to "target telephone."

7.      Third and Final 10-Day Report;
8.      Sealing Application (April 1, 2016); and
9.      Sealing Order (Apr. 4, 2016)

Both parties questioned S/A Wilmsmeyer extensively.  At the conclusion of the April 25th hearing, the undersigned advised the parties that an additional wiretap hearing remained to be conducted and that the parties would be given more time to decide whether to submit any post-hearing briefs.  On May 23, 2017, the undersigned issued a scheduling order regarding post-hearing briefing.  (ECF No. 1029)  That order required any post-hearing memoranda to be filed no later than 14 days following the posting of the transcript of the evidentiary hearing.  The transcript for the April 25th evidentiary hearing was posted on May 31, 2017.  No party filed a post-hearing memorandum, and the undersigned does not believe that post-hearing briefing is necessary to resolve the issues before the Court.  Thus, the Angeles-Montezuma's motion to suppress wiretap evidence is ready for decision.

Based on the testimony and evidence adduced at the evidentiary hearings, having had the opportunity to observe the demeanor and evaluate the credibility of the witness, and having fully considered the parties' written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

The investigation that led to the Superseding Indictment in this case included orders authorizing the government to intercept wire and electronic communications on the five target telephones identified above.  Angeles-Montezuma only challenges the wiretap directed at TT #5. As such, the following findings of fact consider only that target telephone number.

On March 3, 2016, AUSA Wissler appeared before the Honorable Catherine D. Perry, United States District Judge, and submitted an Application for Initial Interception of Wire and

Electronic Communications over telephone number (618) 952-1010, which was referred to in the application, affidavit, and order as Target Telephone #5 ("TT #5"). (Gov't Exh. TT #5-2) The application for TT #5 was accompanied by an affidavit of S/A Wilmsmeyer, which was signed and sworn to before Judge Perry on March 3, 2016. (Gov't Exh. TT #5-3)

S/A Wilmsmeyer's affidavit represented that he and a team were investigating a methamphetamine drug trafficking conspiracy involving Amanda Milbourn, Israel Angeles-Montezuma, and others. According to the affidavit, communications between members of the drug trafficking conspiracy were expected to be intercepted on TT #5, which S/A Wilmsmeyer represented was being used by Amanda Milbourn,[3] but was subscribed to Tilly Eokins, of London, Kentucky. The affidavit identified the four prior Title-III wiretap orders issued in connection with the investigation. The affidavit provided a detailed account of the probable cause supporting the application. The affidavit summarized numerous pertinent conversations intercepted pursuant to prior court authorized electronic surveillance, including a prior Title-III order authorizing the interception of communications on TT #4 – (314) 919-5656, which was being used by co-defendant Bonnie Orman.[4] For example, the affidavit described numerous conversations between Orman and Milbourn, including conversations regarding the arrest of Judy Collins in Utah when Collins was in possession of $90,000 hidden in a rental vehicle.[5] The affidavit explained that Collins told Utah investigators that the vehicle had been rented by "Amigo." The investigation identified Amigo as Defendant Angeles-Montezuma. The affidavit

---

[3] Amanda Milbourn is co-defendant number 6 in this matter. Milbourn filed a written waiver of her right to file motions addressing wiretap matters. (ECF No. 845)

[4] Bonnie Orman is co-defendant number 7 in this matter. Orman filed a written waiver of her right to file motions addressing wiretap matters. (ECF No. 789)

[5] Judy Collins is co-defendant number 16 in this matter. Collins filed a written waiver of her right to file motions addressing wiretap matters. (ECF No. 839)

summarized additional information relative to Angeles-Montezuma's involvement in the drug trafficking conspiracy, and that Angeles-Montezuma was using Collins as a courier. The affidavit further explained how the investigators identified TT #5 and the information and circumstances leading investigators to conclude that Milbourn had discontinued using a predecessor phone and had begun using TT #5, which generally coincided with Milbourn moving from the City of St. Louis to Festus, Missouri, in mid-January 2016. The affidavit explained that the investigative team placed a ruse call to TT #5 to confirm that Milbourn was, in fact, using that telephone number.

The affidavit identified persons whose communications were expected to be intercepted on TT #5. The affidavit also discussed considerations regarding various investigative techniques and the necessity of intercepting communications of TT #5 in view of those considerations. Necessity is discussed in greater detail below.

On March 3, 2016, Judge Perry signed an order authorizing the interception of wire and electronic communications over TT #5. (Gov't Exh. TT #5-4) Thereafter, the government began monitoring communications on TT #5. On March 14, 2016, the government filed its First 10-Day Report regarding TT #5. (Gov't Exh. TT #5-5) On March 23, 2016, the government filed its Second 10-Day Report regarding TT #5. (Gov't Exh. TT #5-6) On Friday, April 1, 2016, the government stopped intercepting communications on TT #5. On April 4, 2016, the government filed its Third and Final 10-Day Report regarding TT #5, as well as a Sealing Application. (Gov't Exhs. TT #5-7, 8) On April 4, 2016, United States District Judge Carol E. Jackson signed a Sealing Order for TT #5. (Gov't Exh. TT #5-9)

At the April 25th evidentiary hearing, the undersigned received into evidence Government's Exhibit 1 for TT #5, an original copy of a letter, dated March 3, 2016, from

AUSA Wissler to S/A Wilmsmeyer, Monitoring Agents, Officers and DEA Special Agent-in-Charge James P. Shroba.  The subject of the March 3rd letter was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facility (618) 952-1010."  (Gov't Exh. TT #5-1, "March 3rd letter" or "Guidelines Letter for TT #5")  The March 3rd letter provided detailed guidance regarding the interception of wire and electronic communications pursuant to the wiretap order directed at TT #5.  This guidance required each monitoring agent to read the affidavit, application, order, and March 3rd letter, and sign and acknowledge that the agent had read and understood the March 3rd letter.  The March 3rd letter provided detailed and comprehensive guidance, including guidance regarding minimization of monitored communications not subject to interception and privileged communications.  Regarding minimization, the March 3rd letter permitted spot monitoring to determine if a subject was participating in the conversation and whether the conversation involved criminal activities.  The letter also addressed minimization of text messages.

At the April 25th evidentiary hearing, S/A Wilmsmeyer testified that AUSA Wissler held an in-person minimization meeting at the DEA office earlier in the investigation.  At the in-person meeting, AUSA Wissler personally explained the minimization requirements for the wiretap interceptions to be conducted in the investigation.  S/A Wilmsmeyer further testified that AUSA Wissler conducted minimization meetings via telephone for the subsequent wiretap authorizations.  Each monitoring agent attended a minimization meeting and received a copy of the corresponding Guidelines Letter.  Each agent also signed a certification representing that prior to monitoring communications from a target telephone the agent read and understood the associated Guidelines Letter.  With respect to the Guidelines Letter for TT #5, there were two certification pages—one for wire monitors and one for electronic (text message) monitors.  Both

certifications were submitted as part of Gov't Exh. TT #5-1.

Additional findings of fact regarding TT #5 are included in the discussion, conclusions of law, and recommendations below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

I.    **Relevant Legal Principles -- Wiretap Issues**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510, et seq., provides for the interception of wire, oral, or electronic communications under certain circumstances.  If the required circumstances are satisfied, and upon proper application of a federal law enforcement officer who has been authorized to make such application by the United States Attorney General (or a lawful designee), a United States District Judge may enter an order authorizing electronic surveillance.  See 18 U.S.C. § 2518 (procedures of interception of wire, oral, or electronic communications).  Courts presume valid authorization unless the person challenging the surveillance makes a prima facie showing that it was not so authorized.  See United States v. O'Connell, 841 F.2d 1408, 1416 (8th Cir. 1988); see also United States v. Radcliff, 331 F.3d 1153, 1160 (10th Cir. 2003).

Under Title III, an "aggrieved person" can move to suppress the contents of intercepted communications, and evidence derived therefrom, on grounds that:

> (1) the communication was unlawfully intercepted;
> (2) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (3) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).  See also United States v. Brown, 941 F.2d 656, 658 n.4 (8th Cir. 1991).  As used in Title III, an "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception

was directed." 18 U.S.C. § 2510(11).

Each wiretap application must include the following information:

(**a**) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(**b**) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(**c**) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(**d**) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(**e**) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(**f**) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518 (1).  A wiretap order may issue upon a proper application if the District Judges

determines:

(**a**) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) [with certain exceptions] there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518 (3). In this regard, the probable cause required for a wiretap "does not differ from that required by the Fourth Amendment for a search warrant." United States v. Macklin, 902 F.2d 1320, 1324 (8th Cir. 1990); see also United States v. Thompson, 690 F.3d 977, 984-85 (8th Cir. 2012).

When reviewing a challenge to a wiretap, courts test the application materials in a "practical and commonsense fashion." United States v. Garcia, 785 F.2d 214, 221 (8th Cir. 1986) (citations and quotations omitted). Thus, "[a] reviewing court must accord broad discretion to the decision to authorize wiretapping …." Id. (citations omitted). "Moreover, those against whom the resulting [wiretap] evidence is admitted have the burden of proving the wiretapping was unlawfully obtained or used." Id. (citation omitted). "[A] party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute." United States v. Fairchild, 189 F.3d 769, 774 (8th Cir. 1999) (citing United States v. Moore, 41 F.3d 370, 374-76 (8th Cir. 1994)).

A.    **Necessity**

Wiretap applications must satisfy the necessity requirements of 18 U.S.C. § 2518(1)(c). Likewise a District Judge issuing a wiretap order "must find that 'normal investigative procedures' have failed or 'reasonably appear to be unlikely to success if tried or to be too

dangerous.'"  United States v. West, 589 F.3d 936, 939 (8th Cir. 2009) (quoting 18 U.S.C. §

2518(3)).  It is well-established, however, that "the necessity requirement does not mandate that

the government 'exhaust all possible techniques before applying for a wiretap.'"  United States v.

Colbert, 828 F.3d 718, 725 (8th Cir. 2016) (quoting Macklin, 902 F.2d at 1326-27 ("The

government is simply not required to use a wiretap as a last resort.")).  Rather, the "necessity

requirement prevents the government from routinely using wiretaps 'as the initial step in an

investigation.'"  Id. (quoting United States v. Thompson, 210 F.3d 855, 858-59 (8th Cir. 2000)).

Thus, in a large drug conspiracy case, "[i]f law enforcement officers are able to establish that

conventional investigatory techniques have not been successful in exposing the full extent of the

conspiracy and the identity of each coconspirator, the necessity requirement has been satisfied."

West, 589 F.3d at 939 (citation and quotation omitted); See also United States v. Milliner, 765

F.3d 836, 840 (8th Cir. 2014) (quoting West).

        Furthermore, the use of seemingly boilerplate language in an affidavit for a wiretap does

not contradict an applicant's claim of necessity.  For example, "[a]n affidavit that explains 'in

general terms why some of the procedures have failed in other investigations and would likely

fail in [the instant case],' satisfies § 2518(1)(c) if it contains 'particular instances in which

normal procedures were used and did in fact fail.'"  Colbert, 828 F.3d at 726 (quoting Macklin,

902 F.2d at 1327).  Similarly, an "affidavit's use of explanations that 'are common to most drug

conspiracy investigations … does not necessarily preclude a finding of necessity under section

2518(1)(c).'"  Id. (quoting Thompson, 210 F.3d at 859 (noting drug investigations can suffer

from "common investigatory problems")).  "Drug crime is necessarily harder to detect [and

investigate] because it is difficult to witness and does not create victims who are compelled to

come forward and report the crime."  United States v. Milliner, 2013 WL 5105783 *6, No. 4:11

CR 263 RWS (TIA) (E.D. Mo. Sept. 12, 2013), aff'd, 765 F.3d 836 (8th Cir. 2014). Because "a large drug conspiracy may be more difficult to fully prosecute without a wiretap, the scope of the investigation must be considered in determining necessity for the wiretap." Id. (citing United States v. Jackson, 345 F.3d 638 (8th Cir. 2003)); United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990)).

In sum, if the government establishes "that conventional investigatory techniques have not be successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." United States v. Turner, 781 F.3d 374, 382 (8th Cir. 2015 (quoting West, 589 F.3d at 939).

### B.    Minimization

In addition to the various prerequisites for obtaining wiretap authority, Title III also includes post-authorization duties, including a duty to minimize unauthorized interceptions. See 18 U.S.C. § 2518(5) (requiring interceptions to be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception"). The "minimization" requirement does not require perfection, but rather objectively reasonable efforts. See United States v. Smith, 909 F.2d 1164, 1167 (8th Cir. 1990) (noting that the court's analysis of a minimization challenge resolves into the reasonableness of the monitoring agents' actions). In Macklin, the Eighth Circuit explained that –

> In considering whether the government's conduct was reasonable, the reviewing court must consider a variety of factors including the scope of the enterprise, the agent's reasonable expectation of the content of a call, the extent of judicial supervision, length and origin of a call, and the use of coded or ambiguous language…. More extensive wiretapping is reasonable when the investigation focuses on determining the scope of a widespread conspiracy…. The same is true when the conversations are in the jargon of the drug trade…. Thus, the government's conduct could be reasonable even if the total number of conversations intercepted contained a high percentage of nonpertinent calls….

902 F.2d at 1328 (emphasis supplied, internal citations omitted).

Further, there is no single best way to minimize wiretap interceptions, and the minimization requirement in "[s]ection 2518(5) 'does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner to minimize the interception of such conversations." West, 589 F.3d at 939 (quoting Scott v. United States, 436 U.S. 128, 140 (1978)).  Moreover, some communications, for example, include both pertinent and nonpertinent content.  Thus, courts have approved reasonable and periodic spot-checking as a reasonable means of minimizing conversations.  See United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) (citing authority for spot-checking).

Finally, the Eighth Circuit has instructed that reviewing courts should consider all of the relevant circumstances, and not focus on percentages.  In West, for example, that Court rejected a defendant's contention that, because monitoring agents minimized only a small percentage of the calls, their procedures were unreasonable.  See 589 F.3d at 940.

## II.    Analysis of Issues Raised Regarding TT #5 – (618) 952-1010

Defendant Angeles-Montezuma is the only defendant herein seeking to suppress evidence gathered as a result of TT #5.  The wiretap for TT #5 was the last wiretap authorized in this matter, and was directed at telephone number (618) 952-1010, a number associated with Amanda Milbourn.  Angeles-Montezuma contends that the government failed to establish necessity to justify the order authorizing TT #5.  Angeles-Montezuma further contends that the monitoring agents failed to properly minimize non-pertinent interceptions.

The undersigned finds that all of the required procedures for authorization, application, the affidavit, court order, reporting, and sealing were followed with respect to TT #5. Furthermore, although no defendant has challenged the probable cause supporting the wiretap

order for TT #5, the undersigned finds that the affidavit recites sufficient probable cause.

### A.    Standing - Angeles-Montezuma

In his motion, Angeles-Montezuma nominally asks the Court to suppress all communications relating to numerous target telephones, but addresses his specific arguments only to TT #5, (618) 952-1010.  Based on the existing record, Angeles-Montezuma only has standing to challenge TT #5.  See 18 U.S.C. § 2510(11) (aggrieved person); United States v. Turner, 2012 WL 12527326 at *14 (E.D. Mo. Dec. 28, 2012) (explaining that "aggrieved person" is not so broad as to include anyone against whom the evidence could be used at trial) (citing In re Grand Jury Proceedings, 841 F.2d 1040, 1054 (11th Cir. 1988)).

### B.    Necessity – TT #5

In his motion to suppress, Defendant Angeles-Montezuma contends that, for a variety of reasons, the affidavit of S/A Wilmsmeyer fails to meet the necessity requirements for a wiretap on TT #5.  For example, Angeles-Montezuma argues that traditional investigatory methods were successful and working, unused methods were prematurely rejected and/or were not too dangerous to employ, and the affidavit relies on general statements and boilerplate language.

The record before the Court does not support Angeles-Montezuma's arguments regarding the necessity showing for TT #5.  The record makes clear that the government did not resort to wiretaps as the initial step in this investigation.  See Colbert, 829 F.3d at 725; Maxwell, 25 F.3d at 1349.  S/A Wilmsmeyer's affidavit sufficiently addresses the various investigatory methods and techniques that had been used and/or considered prior to applying for a T-III order for TT #5.  Those methods and techniques had failed to reveal the broader scope of the conspiracy, its complete membership, and its methods of operation.  Thus, the affidavit satisfied the necessity requirement.

1.    <u>**Overview of Information Submitted Regarding Necessity – TT#5**</u>

The following is a summary of the various investigatory techniques that S/A Wilmsmeyer addressed in his affidavit for TT #5 and referenced in his testimony during the April 25, 2017 evidentiary hearing.

a.    **Surveillance**

There is no dispute that the government used physical surveillance with some success in this investigation, and such surveillance assisted in the identification of some co-conspirators. S/A Wilmsmeyer explained some of the limitations regarding visual surveillance, in particular regarding Amanda Milbourn, the user of TT #5.  For example, S/A Wilmsmeyer explained that surveillance may allow investigators to observe Milbourn meeting with other individuals, but such surveillance would not reveal the meeting's purpose.  Moreover, surveillance had been conducted at two residences associated with Milbourn—one in the City of St. Louis and a later residence in Festus, Missouri.  S/A Wilmsmeyer explained that covert surveillance at both locations had been difficult to maintain, with a poor vantage point, and that at least one time his position was compromised by an apartment manager who asked him to leave.  S/A Wilmsmeyer also explained that, although continued surveillance might result in additional drug seizures and possibly the identification of additional co-conspirators, it would not serve the overall objectives of the investigation, including the identification of the entire organizational structure and positively identify Milbourn's sources of supply, as well as drug transportation and money laundering methods.

b.    **Search Warrants**

S/A Wilmsmeyer's affidavit explained that search warrants were a potential tool in his investigation of the methamphetamine trafficking conspiracy, and that search warrants would

likely result in the seizure of narcotics and evidence of drug trafficking activities.  Such seizures, however, would not reveal the full scope of the drug trafficking organization and the information necessary to prosecute all persons involved.  More specifically regarding Milbourn, S/A Wilmsmeyer represented that the investigators had not yet amassed sufficient probable cause to support a search warrant for any location associated with Milbourn.  Thus, a wiretap on TT #5 would allow the investigative team to develop probable cause for such locations, as well as increasing the likelihood of confirming the roles of suspected co-conspirators and identifying locations and times to execute additional search warrants.  S/A Wilmsmeyer also explained that, although St. Louis County Police executed a search warrant at the residence of a suspected co-conspirator Eric Buhlinger,[6] and that S/A Wilmsmeyer participated in that search, that co-conspirator was not in communication with Milbourn or other known higher ranking members of the methamphetamine trafficking organization.

### c.    Confidential Sources, Informants, and Undercover Agents

S/A Wilmsmeyer's affidavit also explained that five confidential sources had been used during the relevant investigation to that point, yet no confidential source had the present ability to interact with Milbourn directly.  The first three confidential sources (referred to as CS #1 – CS #3) were no longer able to assist the investigation in a proactive manner because those sources did not know the higher level members of the drug trafficking organization.  Although CS #4 had met Milbourn, CS #4 was not able to associate directly with Milbourn.  CS #5 continued to provide assistance relative to suspected co-conspirator Alan Cardenas,[7] but CS #5 did not know

---

[6] Eric Buhlinger is co-defendant number 33 in this matter.  Buhlinger filed a written waiver of his right to file motions addressing wiretap matters.  (ECF No. 858)

[7] Alan Cardenas is co-defendant number 2 in this matter.  Cardenas filed a written waiver of his right to file motions addressing wiretap matters.  (ECF No. 868)

Milbourn.  S/A Wilmsmeyer further explained that the investigative team had not given up on using confidential sources in the future should the opportunity arise.

### d.      Interviews – Targets, Witnesses, and Grand Jury

The investigation identified subjects who could be approached for possible interviews and/or subpoenaed to appear before the Grand Jury.  S/A Wilmsmeyer noted that these subjects were also targets of the primary investigation and other active criminal investigations.  Thus, S/A Wilmsmeyer believed that, in his experience, approaching these subjects was not likely to be fruitful, and could compromise the investigation.  Despite these possible limitations, the investigators took advantage of interactions that occurred by happenstance, such as when co-conspirators were arrested by officers not directly connected to the present investigation.  In some instances, these individuals refused to cooperate with law enforcement.  In other instances, the individuals provided vague, incomplete, false, or uncorroborated information.  The affidavit further described how another individual had provided information, but remained in custody and could not proactively assist the investigation.

S/A Wilmsmeyer explained that using Grand Jury subpoenas to attempt to obtain testimony from the subjects would likely be unsuccessful in furthering the overall goals of the investigation.  Such individuals would likely be uncooperative and assert their privilege against self-incrimination.  Further, the use of immunity might foreclose the prosecution of the most culpable members of the drug trafficking organization, and immunized witnesses might provide false testimony.  Finally, serving subpoenas would likely compromise the scope of the investigation.

### e.      Toll Records Analysis

S/A Wilmsmeyer acknowledged that toll analysis is often useful in identifying co-

conspirators in drug trafficking investigations.  In fact, the affidavit includes a section on the toll record and pen register analysis conducted relative to TT #5 prior to applying for a wiretap order. The issue with toll analysis is that it identifies people but not the criminal conversations occurring.

### f.      Tracking Devices and Cellular Location Data

The affidavit in support of the application for the TT #5 wiretap also addressed the use of tracking devices (e.g., GPS-based tracking devices) and cell phone location data.  Prior to applying for an order to intercept communications on TT #5, the investigative team had already obtained a precision location warrant authorizing Sprint PCS to disclose location information associated with TT #5.  The use of tracking devices, like other techniques, provides useful but limited information.  Location tracking provides information about where a person or a phone might be located (or moving), which is often useful in establishing patterns which might expose potential sources of supply, stash houses, and the like.  But this information often cannot provide important details that would be found by intercepting communications using TT #5.

### g.      Review of Police Records

Police and public records typically only reveal past information.  Therefore, this avenue of investigation was unlikely to yield information relative to current activities.

### h.      Trash Pulls

S/A Wilmsmeyer explained that the investigative team had considered trash pulls as a tool in the investigation, but concluded that the risk outweighed the possible reward.  The possible reward is that evidence recovered could lead to probable cause to search the property associated with the trash or further investigative leads.  But, as discussed above, search warrants were of limited value and trash pulls would not likely result in the identification of leaders of the

conspiracy, how/when the drugs were being delivered, and how proceeds were being hidden. Further, S/A Wilmsmeyer assessed that the risk of compromising the investigation during a trash seizure was too great.  S/A Wilmsmeyer noted that, in his experience, sophisticated drug traffickers are aware that law enforcement will seize trash and, therefore, such traffickers generally do not discard potential evidence with their household trash.  Further, at the evidentiary hearing, S/A Wilmsmeyer testified that he had used this technique in the past with limited success.

### i.    Financial Investigation

S/A Wilmsmeyer also explained that the investigation continued to pursue financial leads and had engaged a financial investigator.  Based on interceptions over the TT #4 (co-defendant Orman's phone), including interceptions relating to a seizure of $90,000 from Judy Collins (discussed above) in November 2015, the investigative team had reason to believe Milbourn likely had bulk currency that she needed to launder.  It was necessary to monitor TT #5 in order to discern the details of the money laundering operations of the organization.  Moreover, records received pursuant to Grand Jury subpoenas duces tecum had, at the time, related to low-level distributors and did not reveal that these persons were involved in money laundering for the drug trafficking organization.  S/A Wilmsmeyer acknowledged, however, that the financial investigation was ongoing.

### 2.    Conclusions Regarding Necessity – TT #5

In his motion to suppress, Angeles-Montezuma advances several arguments why the application to intercept communications over TT #5 failed to meet the necessity requirements. Having fully reviewed the affidavit and testimony from the evidentiary hearing, and in full consideration of the legal principles outlined above, the undersigned finds that the government

satisfied the necessity requirement in connection with its application to monitor TT #5.  The affidavit makes clear the broad and legitimate objectives of the investigation.  The affidavit includes a comprehensive summary of traditional investigative techniques that had been used (or were being used) and those techniques that had been considered and rejected.  The affidavit explains why those traditional techniques, even if fruitful in some respects, would not advance the overall goals of the investigation.

Furthermore, the affidavit and record make clear that the government did not seek to monitor TT #5 as the initial step in this investigation.  See Colbert, 829 F.3d at 725; Maxwell, 25 F.3d at 1349.  But "[t]he government is … not required to use a wiretap as a last resort" either.  Macklin, 902 F.2d at 1326-27.  Thus, contrary to the implications of Angeles-Montezuma's arguments, Title III's necessity requirement does not mean "absolutely necessary," such that the government must completely exhaust traditional techniques before seeking a wiretap order.  See Colbert, 829 F.3d at 725.  Similarly, the fact that traditional investigatory techniques may have been useful in a prosecution of the known participants says little about accomplishing the larger and legitimate goals of the investigation.  Where the focus of the wiretap application is the drug trafficking conspiracy itself, an alleged failure to more fully employ traditional investigative techniques does not suggest a lack of necessity.  See Jackson, 345 F.3d at 644-45; see also United States v. Lee, 436 F.3d 751, 763 (7th Cir. 2006); Unites States v. Staves, 383 F.3d 977, 982 (9th Cir. 2004).  Where, as here, the government establishes "that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."  Turner, 781 F.3d at 382 (citation omitted).

For completeness, the undersigned will briefly address several of Angeles-Montezuma's

specific arguments.  Angeles-Montezuma contends that traditional investigative methods were successful and working.  According to Angeles-Montezuma, investigators gave up surveillance of Milbourn's residence when it remained possible to simply move locations.  First, as a factual matter, S/A Wilmsmeyer's affidavit explained that he conducted surveillance at Milbourn's former and current residences, and that his surveillance at Milbourn's current residence was interrupted/compromised by the management of the apartment complex.  Thus, the affidavit clearly showed that the investigative team had attempted surveillance prior to seeking a wiretap order and why further surveillance was less likely to be successful regarding Milbourn.  Second, even though surveillance was useful, and even assuming future surveillance would also be useful, such continued surveillance would not provide evidence of the entire scope of the conspiracy.

Similarly, Angeles-Montezuma contends that the investigative team prematurely gave up unused methods such as search warrants,[8] and that unused methods were not too dangerous to pursue.  On the record before the Court, such contentions are not persuasive.  The affidavit explains why some unused methods were likely to fail and might compromise the investigation.  The wiretap statute does not require more.  See Macklin, 102 F.2 at 1327; see also Colbert, 829 F.3d 718, 725.

Moreover, it is not sufficient for a person challenging a wiretap to allege that investigative techniques remained which were not too dangerous.  "Even if other investigative

---

[8] S/A Wilmsmeyer's affidavit represented that investigators lacked sufficient probable cause to obtain a warrant to search Milbourn's property.  Angeles-Montezuma's arguments suggest that if there was probable cause for the crime, there was probable cause for Milbourn's home; or that a lack of probable cause for the home suggested a lack of probable cause for the wiretap order.  These arguments are logically flawed.  The affidavit provided overwhelming probable cause to conclude that Milbourn had personally been involved in methamphetamine trafficking and that she and others used mobile phones to communicate relative to their drug trafficking and related activities.  The affidavit also indicated that Milbourn had recently moved.

techniques were not dangerous, 'Congress <u>prohibited</u> wiretapping only when normal investigative techniques are likely to success <u>and</u> are not too dangerous.'" <u>United States v. Milliner</u>, 765 F.3d 836, 840 (8th Cir. 2014) (emphasis in <u>Milliner</u>) (quoting <u>United States v. Daly</u>, 535 F.2d 434, 438 (8th Cir. 1976)).  As in <u>Milliner</u>, "[h]ere, some normal techniques were tried and failed (or were unlikely to succeed in the first place), so the non-dangerous nature of these techniques is irrelevant." <u>Id.</u>

Finally, the fact that S/A Wilmsmeyer's affidavit used "explanations that 'are common to most drug conspiracy investigations … does not necessarily preclude a finding of necessity.'" <u>Id.</u> (quoting <u>Thompson</u>, 210 F.3d at 859 (noting drug investigations can suffer from "common investigatory problems").  Likewise, "a large drug conspiracy may be more difficult to fully prosecute without a wiretap, the scope of the investigation must be considered in determining necessity for the wiretap." <u>Milliner</u>, 2013 WL 5105783 at *6 (citing <u>United States v. Jackson</u>, 345 F.3d 638 (8th Cir. 2003); <u>United States v. Smith</u>, 909 F.2d 1164, 1166 (8th Cir. 1990)).  There can be no doubt that this case reflects a very large drug trafficking conspiracy.  There are forty-two named defendants.  At the time of the application for the wiretap order on TT #5, the scope of the entire conspiracy remained unknown, but S/A Wilmsmeyer's affidavit demonstrates that the contours of the drug trafficking organization were very broad in scope.  Thus, on any common sense reading of this affidavit, one could reasonably conclude that this drug trafficking conspiracy would have been extremely difficult, if not impossible, to fully investigate without resorting to wiretaps, including a wiretap on TT #5.

For these reasons, the undersigned finds that the government met the necessity requirement with respect to the wiretap application for TT #5.

### C.      Minimization – TT #5

Angeles-Montezuma also argues that the government failed to minimize non-pertinent

communications.  Angeles-Montezuma has not raised any meaningful concerns regarding the

procedures put in place.  For example, his motion to suppress does not reference the AUSA's

Guidance Letter for TT #5.  Rather, Angeles-Montezuma argues generally that there was a

"staggering number of non-pertinent conversations monitored by the listening agents," and "the

agents virtually ignored the minimization requirement."  (ECF No. 870 at ¶¶ 40, 42)  The

evidence and testimony adduced at the April 25, 2017, evidentiary hearing does not support

Angeles-Montezuma's contentions in this regard.  To the contrary, the evidence and information

available leads to a conclusion that the government employed objectively reasonable

minimization procedures.  See United States v. Williams, 109 F.3d 502, 507 (8th Cir. 1997)

("Whether the government complied with the [minimization] requirements of section 2518(5) is

determined by an objective reasonableness standard.") (citing Scott v. United States, 436 U.S.

128, 137-38 (1978); Macklin, 902 F.2d at 1328); Garcia, 785 F.2d at 221-24 (it is a defendant's

burden to show that the government failed to adhere to the statutory minimization requirements).

As outlined above, the government planned for and employed comprehensive

minimization procedures in conjunction with the wiretaps used in the investigation.  Prior to

monitoring any telephones in the investigation in this matter, AUSA Wissler conducted an in-

person minimization meeting with relevant members of the investigation team.  With respect to

TT #5, AUSA Wissler held a telephonic conference call with monitoring agents to review

minimization procedures.  AUSA Wissler also provided a detailed, written guidance letter

concerning the minimization procedures to be employed while monitoring TT #5.  (See Gov't

Exh. TT#5-1)  AUSA Wissler's letter identified the target telephone and the anticipated

interceptees.  The guidance letter specifically required each participating agent to know the contents of the court order, the type of conversations to be intercepted, the offenses to which the conversations may relate, and the requirement that the monitoring be conducted to minimize the interception of non-pertinent, non-criminal and privileged communications.  AUSA Wissler's letter required every monitoring agent (including deputized task force officers) to "thoroughly read the affidavit, application, order and this letter."  (Id. emphasis in original)  The letter further required that a copy of the order be posted in the monitoring room during the entire period of interception.  Each monitoring agent was also required to sign a certification indicating that they read and understood AUSA Wissler's guidance letter relative to TT #5.  The government submitted the original certification pages.  The letter provided detailed instructions for complying the statutory minimization requirement, including separate instructions for wire (voice) and electronic (text messages) communications.

AUSA Wissler's guidance letter was consistent with the minimization requirements set forth in Judge Perry's Order authorizing the wiretap on TT #5.  (See Gov't Exh. TT #5-4)  The minimization procedures outlined in Judge Perry's Order and employed in AUSA Wissler's guidance letter satisfy the statutory requirements of 18 U.S.C. § 2518(5).  Additionally, the government provided detailed 10-day reports and a sealing application in connection with the monitoring of TT #5.  Based on a review of the letter and S/A Wilmsmeyer's testimony at the evidentiary hearing, the undersigned concludes that the government did, in fact, employ objectively reasonable efforts to minimize any unauthorized interceptions.  See Smith, 909 F.2d at 1167.  Nothing more is required.

Finally, even though Angeles-Montezuma contends that there were calls that should have been minimized but were not, he has not identified any specific call that should have been

minimized and that was non-pertinent or privileged.  The fact that some unidentified non-pertinent communications were not minimized does not give a defendant the windfall of suppression of all communications, including those squarely within the ambit of the wiretap order.  See United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972).[9]

For the foregoing reasons, the undersigned concludes that Angeles-Montezuma's request to suppress evidence based on improper minimization should be denied.

## CONCLUSION

For the reasons set forth above, Angeles-Montezuma's Motion to Suppress Wiretap Evidence should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Angeles-Montezuma's Motion to Suppress Wiretap Evidence (ECF No. 870) be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Pretrial proceedings have not concluded in this matter.  Consistent with the undersigned's scheduling orders in this matter, the foregoing Report and Recommendation addresses only

---

[9] "Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations.  The nonincriminating evidence could be suppressed … but the conversations the warrant contemplated overhearing would be admitted." Cox, 492 F.2d at 1301 (citations omitted).  See also United States v. West, 2008 WL 2373033 at *7 (E.D. Mo. June 6, 2008) (quoting Cox), aff'd, 589 F.3d 956 (8th Cir. 2009).  In United States v. Ozar, the Eighth Circuit reversed a district court's suppression of all communications for a failure to adequately minimization numerous, potentially privileged communications.  See 50 F.3d 1440, 1448 (8th Cir. 1995).  Referring to Cox, the Eighth Circuit concluded that the "punitive use of the suppression remedy was error." Id.

issues relating to any motions directed to electronic surveillance in general, and wiretap motions in particular.  The trial of this matter will be set by the Honorable Catherine D. Perry, United States District Judge, at the conclusion of all pretrial proceedings.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of  June , 2017.